## HAVEN et al., Appellants, v. TARTAR, Respondent.

St. Louis Court of Appeals, April 30, 1907.

1. BROKERS: Contract of Employment: Evidence. The owner of a farm put it in the hands of a firm of real estate brokers for sale for five days on certain terms, and two days later the brokers sent their employee to the owner with a letter relating to the matter and asking the owner to write on the back of the letter the arrangement he desired to make with them about the terms of sale. On the same day another employee of the brokers concluded a sale of the land without revealing to the owner his relation to the brokers. *Held*, in an action by the bro-

Haven v. Tartar.

kers for a commission, the letter and note of defendant on the back were admissible in evidence as showing the contract under which the brokers were authorized to sell and which superseded the previous oral agreement.

2. ———: ———: **Fraud of Owners.** A firm of real estate brokers had in charge, for sale, a farm, on terms whereby they were to realize a certain sum net to the owner, and the owner reserved the right to sell himself. An employee of the firm, who denied his relation to them, closed a sale whereby the purchasers paid him a small commission and the owner got his price. *Held,* the owner was not liable to the brokers for a commission unless they were parties to the fraud which the employee perpetrated on his employers, the brokers. The owner was not liable if he was led by the employee to believe he was not in the employment of the brokers.

3. ———: ———: ———: **Instruction.** In an action by the brokers for a commission, an instruction which authorized a verdict for defendant if the plaintiff had consented to the reduced commission paid plaintiff's agent, was error because it left out of consideration the question of good faith or fraud on the part of the defendant.

Appeal from Lawrence Circuit Court.—*Hon. F. C. Johnston,* Judge.

REVERSED AND REMANDED.

*John H. Flanigan* and *E. O. Brown* for appellants.

Courts zealously guard against the efforts of principals to avoid the payment of legitimate commissions to agents whom they have employed in the sale of their property. The rule is that, "Where the broker is the instrument through which the sale has been effected, no sort of artifice, deceit or fraud, will deprive him of his commission." Corder v. O'Neill, 176 Mo. 401; Brackenridge v. Claridge, 43 L. R. A. 593.

*William B. Skinner* for respondent.

Where parties have reduced their contract to writing, it will be conclusively presumed, in the absence of fraud, accident or mistake, that such writing includes

the whole engagement and the extent and manner of the undertaking. Morgan v. Porter, 103 Mo. 135; Broughton v. Null, 56 Mo. App. 231.

GOODE, J.—The defendant owned a farm of 475 acres in Lawrence county, Missouri, for which he asked twenty-five dollars an acre, or $11,875; but was willing to accept $11,000. Stating the testimony in the phase most favorable to plaintiffs, defendant, on April 12, 1905, put the property in their hands to sell for twenty-five dollars an acre, plaintiffs to have as a commission the excess of the price above $11,000, or $875. The right to sell was given the plaintiffs exclusively for five days. Plaintiffs were a firm of real estate brokers in Carthage, Missouri, the style of the firm being the Frisco Land Company and the members F. G. Haven and G. W. Bishop. In their employ were two men by the names of Montgomery and Meyers. Defendant had seen Montgomery about plaintiffs' office and understood he was their employee. The land was sold to W. W. Calhoun and C. F. McElroy, on April 14, by the assistance of Montgomery, who went with the two buyers to the farm where they, the defendant and Montgomery conducted a negotiation throughout the day, concluding the sale for $11,000 late in the afternoon. The testimony tends to show the negotiation between Calhoun and McElroy came about in this way: On April 13, the day before the sale, Calhoun while passing the office of the Frisco Land Company, in Carthage, saw Montgomery sitting in the office and stepped in to see about a trade Montgomery was endeavoring to make of a piece of town property owned by Calhoun for a farm in the country. Meyers was also in the office at the time but nothing passed between him and Calhoun. Montgomery told Calhoun he had a farm for sale in Lawrence county that he thought Calhoun would buy if he would go to see it. He stated the quantity of land to Calhoun and the price at twenty-five dollars an

acre.    Calhoun declined to go to view the farm but spoke to McElroy about it on the same day and they decided to go.    Montgomery hired a vehicle and team and drove Calhoun and McElroy to the farm.    On the same morning Meyers, the other employee of the Frisco Land Company, had driven to the farm and was in conversation with defendant when Montgomery and his customers arrived.    Meyers took the following letter to defendant:

"Carthage, Mo., April 13, 1905.
"Mr. Frank Tartar:

Dear Sir:   This will introduce to you Mr. Hal Meyers, who is working with me in the real estate business, and any arrangements made with him, concerning the sale of your farm, will be satisfactory with me.   I will have some other parties up before the five days are up, to look at your farm.   I think perhaps we will have a party there tomorrow.

"Any arrangement you make with Mr. Meyers, please put on the back of this, so I will understand them.

"Yours respectfully,
"FRISCO LAND COMPANY,
"By G. W. BISHOP.

Pursuant to the request contained in the letter, Tartar wrote on the back of it as follows:

"FRISCO LAND COMPANY.

April 14, 1905.
"Mr. Bishop:   I will give you a price of $11,000 on my farm for ten days.   Possession in fall, reserving the privilege to sell to others.

"B. F. TARTAR."

The sending of Meyers to Tartar with the letter on the morning of April 14, when the plaintiffs knew Montgomery was going out with Calhoun and McElroy, looks mysterious.   Meyers swore he was sent to get Tartar to

agree to pay the Frisco Land Company a commission; a strange explanation, as, according to plaintiffs he had agreed on the twelfth to pay a commission and to accept the same net price he offered to accept on the fourteenth. Meyers swore Tartar promised him on the fourteenth to price the land at twenty-five dollars an acre to any customer the Frisco Company might send out and to allow said company the excess over $11,000 if a sale was made; the same agreement made on the twelfth, if Bishop swore truly, except that one was for five days and the other for ten. Tartar swore that, in the course of the conversation between him and Meyers, the latter said the land . must be priced at twenty-five dollars an acre, but the Frisco Land Company would sell it so as to earn a commission of only $100, if no better price could be obtained. While Meyers and Tartar were conversing, Montgomery was seen to approach with Calhoun and McElroy; whereupon Meyers said their customer was coming and he did not want to be seen by the customer, because the latter would think the Land Company was trying to extort a commission from him. Meyers seems to have gotten away from the farm without being seen by Calhoun and McElroy. Tartar priced the land at twenty-five dollars an acre, but Calhoun and McElroy flatly refused to pay more than $11,000. Tartar says he asked twenty-five dollars an acre for the benefit of plaintiffs, taking it for granted that Montgomery was their employee and as such had brought Calhoun and McElroy to the farm. Montgomery denied representing pla. tiffs and declared he was acting in his own behalf. Calhoun and McElroy declared they had nothing to do with plaintiffs and had never spoken to them about the farm. Those three men said they would swear to the truth of their statements in any court. Tartar was suspicious and endeavored until late in the day, in various ways, to ascertain if Montgomery was telling the truth, or, whether or not, he was in the service of the Frisco Land Company (plain-

tiffs). He says he was finally persuaded of the truth of the assurances of Montgomery, Calhoun and McElroy that plaintiffs were not concerned in the deal and, so believing, sold the farm for $11,000, his net price, Calhoun and McElroy agreeing to pay Montgomery a commission of $100. Calhoun testified he did not know Montgomery was in plaintiffs' service. The present action was instituted to recover $875 from the defendant as commission for the sale of the land, plaintiffs alleging they found the purchasers, or induced the sale. The original petition was in two paragraphs and against both Tartar and Calhoun. In the first paragraph plaintiffs set out *in haec verba* the writing signed by Tartar on April 14, alleging that it was a contract on his part to sell the farm to plaintiffs for $11,000, with the right reserved to sell to any customer not found by plaintiffs. It was alleged that on April 14, 1905, plaintiffs procured Calhoun to become a purchaser of the land, defendant having previously agreed to fix a price of $11,875, so plaintiffs would thereby earn a commission of $875, as agreed in said writing; that Calhoun and Tartar conspired to defraud plaintiffs of their commission and made an agreement by which Calhoun purchased of Tartar for $11 000; that both men knew of the existence of the written contract at the time and that the sale was being made to a purchaser found by plaintiffs; wherefore the plaintiffs offered to pay into court the sum of $11,000 and prayed that a decree be entered vesting the title of the land in them. In the second paragraph, it was charged that the defendant employed plaintiffs to sell the farm for twenty-five dollars an acre; that they procured Calhoun, who was able, ready and willing to buy said land as a purchaser at that price; that the two defendants combined and agreed to cheat plaintiffs out of their commission by making a bargain by which Tartar sold to Calhoun for $11,000. An amended petition was filed later, from which Calhoun was dropped as a defendant

and which alleges, in substance, that Tartar engaged plaintiffs to sell his farm for $11,875, agreeing to pay them $875 for doing so; that plaintiffs found, procured and introduced to defendant a purchaser who was able, ready and willing to buy land and to whom defendant sold it; that the sale was made within the time for which the plaintiffs were engaged, "and for the purpose and in an attempt to defeat these plaintiffs of their commission," was made at the price of $11,000. Defendant's answer was a general denial.

One assignment of error is the admission in evidence of the letter written by plaintiffs to Tartar on April 13, and his writing on the back. It is contended in behalf of plaintiffs that they did not act on the authority contained in those writings when they interested Calhoun and McElroy, but on a previous oral authority given April 12, for five days. We hardly understand this contention. The undisputed evidence for the plaintiffs is that their agent Meyers was sent to Tartar on April 14 with a letter dated April 13, and his purpose in going was to make sure of a commission if a sale was made that day; plaintiffs knowing one was in prospect and that Montgomery was on the way to defendant's farm, accompanied by Calhoun and McElroy, who were thinking of buying. Let us grant that defendant had given plaintiffs oral authority on the twelfth for five days to sell his farm at twenty-five dollars an acre, yet manifestly this oral agreement was superseded and merged in the later written one of April 14. The second agreement was made and put in writing on the express solicitation of plaintiffs. It seems to be the theory of plaintiffs' counsel that the writings conferred the right on plaintiffs to buy the farm themselves, not to sell as brokers; hence, that it did not supersede the prior oral arrangement by which they were to sell as brokers at twenty-five dollars an acre. This view of the contract shown by the writings is inconsistent, not only with their lan-

guage, but with the surrounding circumstances. It is true defendant's note said he would give plaintiffs a price of $11,000 on the farm for ten days, and it may be argued that this was an agreement to give them an option to buy. But if we look at the letter which elicited the agreement, its meaning is shown to include power to plaintiffs to sell as brokers so that defendant would realize $11,000 net. In plaintiffs' letter to defendant they said they would bring some other parties to see the farm before the five days were up and, perhaps, tomorrow; a statement showing the arrangement plaintiffs authorized Tartar to make with Meyers was for a sale of the farm by plaintiffs. Neither the meaning of the writings nor that they contained the contract under which plaintiffs were authorized to act as defendant's agent, is doubtful, and we rule they were competent evidence. The evidence shows beyond doubt that Montgomery was plaintiffs' employee and as such took Calhoun and McElroy to the farm, introduced them to defendant and started the negotiation which led to the sale. Nevertheless, it does not follow that plaintiffs were entitled to a verdict on all the facts in proof. They were the victims of a fraud perpetrated by their man Montgomery and the true issue was as to whether or not defendant was a party to the fraud. The letter carried by Meyers on the morning of April 14, said any arrangement defendant made with him would be satisfactory. Pursuant to this notice of the extent of the authority of Meyers, defendant arranged to give plaintiffs a price of $11,000 for ten days, reserving the privilege to sell to others. Under this agreement he had the right to sell to any buyer not procured by plaintiffs and a further right to sell to any buyer procured by them, for as low a price as $11,000, if plaintiffs' agent in charge of the deal was willing to take it, unless defendant knew the agent was acting contrary to his instructions in doing so. Calhoun and McElroy came with Montgomery,

whose apparent authority in the affair was complete. Under these circumstances we do not see how defendant was liable unless he knew, not only that Montgomery was plaintiffs' agent, but that he was violating his trust in selling for $11,000. If he knew these facts he is liable, as having been a party to a fraud on plaintiffs, practiced in order to enable him to get his net price for the farm from Calhoun and McElroy, who were unwilling to be out any more than $11,100 in the deal. [14 Am. and Eng. Ency. Law (2 Ed.), pp. 152 to 155, inclusive.] This view of the law was not taken in trying the case and it is doubtful if the statement pointing toward fraud contained in the petition was definite enough to let in evidence to prove defendant was a party to a fraud. Defendant swore he would not sell until Calhoun and McElroy agreed to take care of Montgomery and Bishop, one of the plaintiffs. This statement shows, at least, that defendant suspected Bishop was being wronged in some way; and it might induce the belief that defendant was in collusion with the other parties in a scheme in fraud of plaintiffs' rights. As fraud may be proved by circumstances and sometimes by very minute ones, we are unwilling to say there are no facts in proof that would justify an inference against defendant, especially as the case was disposed of on other issues.

The court gave six instructions for the plaintiffs; all very favorable to a recovery and telling the jury, in effect, that when a broker employed to sell real estate had by himself, or his employees, introduced a purchaser acceptable to the owner, and willing and able to purchase on satisfactory terms, he has performed his duty and is entitled to a commission for the sale, even though it is not consummated by his efforts. The same rule was expressed more specifically in an instruction which stated that if defendant promised plaintiffs to price his farm at $11,875 to any prospective purchaser plaintiffs might secure, and pay them the excess above $11,000 for

which the farm was sold to such purchaser, and thereupon the plaintiffs, through their agent, entered into a negotiation with Calhoun and notified defendant they were negotiating with him, and shortly afterwards defendant sold his farm to Calhoun and McElroy for $11,000, the verdict should be for plaintiffs for $875, provided they were the procuring cause of the sale. These two instructions were repeated in different phases in the four others given at plaintiffs' instance. They lost sight, not only of defendant's right to a verdict if he was guilty of no fraud, but also of the defense interposed, which was that if defendant was imposed on by Montgomery and the buyers and led to believe the latter were not plaintiffs' customers and that Montgomery was not their employee, and did not represent them, there could be no recovery. This defense was presented in an instruction given for the defendant and so framed as to hold before the minds of the jury the supposed right of plaintiffs to a verdict if defendant knew Montgomery was in their service. Plaintiffs have no reason to complain of that charge.

Complaint is made of another instruction given for the defendant, to-wit; that if the jury believed the Frisco Land Company, through their authorized agent, informed defendant said company would not stand on a commission of $875, but would sell the farm if they could procure no greater commission than one hundred dollars, and Montgomery did sell for a commission of one hundred dollars, the verdict should be for defendant. There is said to have been no evidence to support that instruction. It was granted, no doubt, on defendant's statement that Meyers told him, on the morning of the sale, plaintiffs would ask twenty-five dollars an acre for the farm, but if necessary, would cut the price so they would receive a commission of only one hundred dollars. On the theory of liability adopted by defendant, the only question was whether defendant was led to believe Mont-

gomery was not representing plaintiffs, but acting in his own behalf. The effect of the instruction in question was to excuse defendant from liability to plaintiffs for a commission if he had been told they would accept a price which would yield them but one hundred dollars and a sale was afterwards made by their agent who received a commission of one hundred dollars. The facts predicated could in no event be a defense unless defendant was acting in good faith; which was not required to be found. If he was acting in collusion with Montgomery and the buyers to keep plaintiffs from getting more, the fact that plaintiffs were willing to put up with a commission of one hundred dollars if they could do no better, would be no defense. It is earnestly contended the verdict was for the right party and, therefore, the judgment ought to be affirmed. However cogent in defendant's favor the evidence may be, there is sufficient room for inference against him to take the cause to the jury. Hence correct instructions were important.

The judgment is reversed and the cause remanded. All concur.